FILED
2014 Jan-10  PM 03:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| WELLS FARGO FINANCIAL LEASING INC., | } } } | |
| Appellant, | } } | DISTRICT COURT CASE NO. 1:13-CV-1821-WMA |
| v. | } } | BANKRUPTCY CASE NO. |
| ANTHONY EVAN GRIGSBY, debtor; CHRISTY MECHELLE GRIGSBY, joint debtor; LINDA BAKER GORE, trustee; et al., | } } } } } | 13-40564-JJR12 |
| Appellees. | } | |

## MEMORANDUM OPINION

Wells Fargo Financial Leasing, Inc. ("Wells Fargo"), appeals from the bankruptcy court's order confirming the amended chapter 12 plan of Anthony Grigsby and Christy Grigsby ("the Grigsbys" or "the debtors"). The plan confirmation order qualifies as a "final decision" of the bankruptcy court such that this court has appellate jurisdiction pursuant to 28 U.S.C. § 158. *See United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 269 (2010). Wells Fargo asks this court either to reverse the plan confirmation order or to modify Wells Fargo's treatment under the plan. For the reasons detailed below, Wells Fargo's appeal will be unsuccessful and the plan confirmation order will be affirmed.

## FACTUAL BACKGROUND

The parties do not dispute the underlying material facts, only

1

their significance for the plan's treatment of Wells Fargo's secured debt.  The secured debt at issue is a loan by Wells Fargo to the Grigsbys dated December 7, 2007, as subsequently modified and refinanced.  The loan's collateral consists of a first lien on Etowah County property (including the Grigsbys' residence, real estate, and poultry houses); a second lien on Baldwin County property (including a rental residence and real estate); agricultural equipment; and sale proceeds from the Grigsbys' poultry flocks.  Before bankruptcy, the Grigsbys paid the poultry proceeds to Koch Foods pursuant to an assignment ("Proceeds Assignment"), and Koch Foods paid Wells Fargo.  The parties have stipulated that the value of the Etowah County property (including the residence, real estate, and poultry houses) is $775,000, and that the principal balance of the Wells Fargo's loan was $707,728.24 as of June 30, 2013.

The Grigsbys filed a joint petition for chapter 12 bankruptcy on March 19, 2013.  The bankruptcy court confirmed the Grigsbys' amended plan over Wells Fargo's objection on August 23, 2013.  The confirmed plan provides for Wells Fargo's secured debt to be repaid over eighteen years.  The repayment interest rate escalates over time: 5.25% for 5 years, 6.00% for 5 years, then 6.50% for 8 years. The Grigsbys must make the plan payments directly to Wells Fargo within seven days of receiving payment for their poultry flocks.

At the hearings on plan confirmation, the bankruptcy court

admitted four pieces of evidence regarding the market for the financing of loans like the Grigsbys' loan: (1) Victor Dutchuk's affidavit, which states that a loan secured by existing poultry houses and related equipment would have a twelve-year term in the current market but, if secured by new poultry houses and equipment, the loan would have a fifteen-year term; (2) James Bevis's affidavit, which states that a loan secured by existing poultry houses and related equipment would have no longer than a seven-year term in the current market; (3) Mr. Grigsby's testimony that he attempted to secure financing to pay off the Wells Fargo loan but could not find a willing lender; and (4) eight mortgages originating in 2009-12 that are secured by real estate with poultry houses and have terms ranging from eleven to twenty-three years.

Wells Fargo filed a notice of appeal on August 23, 2013, seeking reversal of the plan confirmation order or modification of its treatment under the confirmed plan.

## DISCUSSION

This court sits as an appellate court when reviewing bankruptcy courts' "final decisions." 28 U.S.C. § 158. It reviews those decisions under a clearly erroneous standard for findings of fact and under a *de novo* standard for conclusions of law, including interpretations of the bankruptcy code. *Equitable Life Assurance Soc. v. Sublett* (*In re Sublett*), 895 F.2d 1381, 1383-84 (11th Cir. 1990). The "final decision" under review in this appeal is the

plan confirmation order.

Wells Fargo is complaining about the plan confirmation order's treatment of its secured debt.  A chapter 12 bankruptcy plan may modify the rights of secured creditors provided that the plan complies with 11 U.S.C. § 1225(a)(5).[1] *Travelers Ins. Co. v. Bullington*, 878 F.2d 354, 357 (11th Cir. 1989).  The plan in this case must comply with the "cramdown" provisions of § 1225(a)(5) because Wells Fargo has not accepted the plan and the Grigsbys do not intend to surrender the collateral. *See* § 1225(a)(5)(B)(i)-(ii).  The "cramdown" provisions permit the plan to be confirmed over Wells Fargo's objection if the plan payments have a "present value" equal to the allowed secured claim and if Wells Fargo "retains" its lien. *See id.*

Wells Fargo contends that the confirmed plan fails to satisfy both cramdown provisions, i.e., receiving present value and retaining the lien, because the repayment term exceeds the length dictated by the market and the payer and payment amounts diverge from those designated in the Proceeds Assignment.[2]  Each contention is addressed in further detail below.  This court concludes that the bankruptcy court applied the correct legal analysis to each

---

[1]   Further references to 11 U.S.C. § 101 et. seq. (the Bankruptcy Code) will be by section number only.

[2]   Although Wells Fargo contested the repayment interest rate in its objection to the amended plan and mentions the interest rate as an aside in its brief, Wells Fargo's brief does not explicitly appeal the confirmation order on that basis. Appellant's Br. 7-8, 39.

issue and did not clearly err in confirming the plan.

## A.   Receiving Present Value

Wells Fargo argues that the eighteen-year repayment term in the confirmed plan does not provide "present value" equal to its allowed secured claim, as required by § 1225(a)(5)(B)(ii). Specifically, Wells Fargo argues that (1) the bankruptcy court clearly erred in its finding of fact that no efficient market exists for loans like the Grigsbys' loan; and (2) the bankruptcy court erred as a matter of law in concluding that the market alone does not dictate the repayment term.

### (1)   Finding that no efficient market exists

In the confirmation order, the bankruptcy court found that no efficient market exists for loans like the Grigsbys' loan. BK Doc. 129, ¶ 11.[3]  Wells Fargo contends that this finding was clearly erroneous.  This court concludes that the bankruptcy court did not clearly err in its finding given that Wells Fargo's evidence was not directly relevant, at least according to the evidence before the bankruptcy court, and Mr. Grigsby's uncontradicted testimony that he could not find a willing refinancing lender.[4]

---

[3] The court cites to documents filed in the bankruptcy court according to their bankruptcy docket numbers, instead of to the appellate record, because the record does not have continuous pagination between documents.

[4]  The Grigsbys also submitted evidence of eight loans originating in 2009–12 and secured by real estate and poultry houses.  This evidence does not shed light on whether there is an efficient market for similar loans in 2013. Accordingly, the bankruptcy court did not explicitly consider those loans when

Wells Fargo submitted two affidavits as evidence on the market for loans secured by poultry houses and related equipment——**not** on the market for loans like the Grigsbys' loan secured by poultry houses, related equipment, real estate, residences, and poultry proceeds.  On appeal, Wells Fargo argues that the two categories are equivalent because "the true value of [the] Collateral flows from the income-generating potential of the poultry farming operation, not the dirt on which the farm is situated," and "not from the fact that the Debtors reside on the property." Appellant's Reply 2, 22.  This argument should have been made to the bankruptcy court.  The bankruptcy court had no evidence before it that the poultry houses, related equipment, and poultry proceeds constitute the principal collateral and that the real estate and residences have no significant value as collateral.  Such evidence, if it had been submitted, might have made the affidavits of Wells Fargo's experts more relevant.  Those affidavits give information on the market for loans secured by poultry houses and related equipment **only**, irrespective of whether the experts were subjectively aware of the other collateral.  The bankruptcy court found a distinction between loans secured by poultry houses and related equipment versus loans secured by poultry houses, related equipment, real estate, residences, and poultry proceeds, and weighed the evidence

---

assessing the market efficiency, although it did consider them when assessing the plan term.

accordingly.  Based on the evidence before the bankruptcy court, this court cannot conclude that the bankruptcy court clearly erred in drawing that distinction and so weighing the evidence.

Given that Wells Fargo did not submit evidence with demonstrated relevance to the market for loans like the Grigsbys' loan, the bankruptcy court had to assess the market using only Mr. Grigsby's testimony that he could not find a willing lender to refinance his loan.  Based on this evidence, the bankruptcy court did not clearly err in finding that no efficient market exists for loans like the Grigsbys' loan.

### (2)   Conclusion that the market is not determinative

The bankruptcy court stated in its confirmation order that "the treatment of Wells Fargo's secured claim does not have to match the treatment the Debtors could obtain in the marketplace because no efficient market exists" and that, "[w]hile the credit market for new loans is a factor for the Court to consider, it is not controlling." BK Doc. 129, ¶¶ 11, 13.  Wells Fargo argues that the bankruptcy court erred in its conclusion of law that the market does not control the assessment of the plan term.  This court finds that the bankruptcy court did not err in its legal analysis and did not clearly err in approving the term of the Grigsbys' plan.

Framing the discussion of the market's role in assessing plan terms is the Eleventh Circuit case *Travelers Ins. Co. v. Bullington*, 878 F.2d 354 (11th Cir. 1989).  In *Travelers*, the

Eleventh Circuit states that "the test is simply whether, as of the effective date of the plan, the present value of the property ... is equal to or greater than the amount of the allowed secured claim." *Id.* at 357.  The Eleventh Circuit does not mention the market as part of this test. *Id.*  Although the plan in *Travelers* complied with the market of interest rates for thirty-year mortgages, the Eleventh Circuit does not discuss any evidence on whether the thirty-year **term** complied with the market. *Id.* Furthermore, the fact that the Eleventh Circuit approved a plan that looked to the market and complied with the market, at least in part, does not mean that courts **must** look to the market or look **only** to the market. *See id.* at 357–58.  At most, *Travelers* suggests that the market should be a factor in evaluating whether the plan term and interest rate provide present value. *See id.*

Wells Fargo heavily relies on *In re Koch*, 131 B.R. 128 (Bankr. N.D. Iowa 1991), but *Koch* expressly disagrees with *Travelers* and characterizes it in a way unfavorable to Wells Fargo's position. *Koch* characterizes *Travelers* as following the "mathematical approach," which allows confirmation if the plan "simply [provides] for the present value of the secured claim at confirmation over the life of the plan, **regardless of the length**." *Id.* at 131 (emphasis added).  *Koch* expressly disagrees with this approach and follows the "market approach," which requires the plan to comply with the market. *Koch*, 131 B.R. at 131–32.  In short, Wells Fargo gains

8

nothing from relying on a case contrary to binding precedent that characterizes *Travelers* as not requiring adherence to the market.

More persuasive to this court is a case that does not impose any requirements contrary to *Travelers*. *See First Nat'l Bank v. Woods (In re Woods)*, 465 B.R. 196 (10th Cir. BAP 2012). *Woods* notes that "the market is not the only means by which the bankruptcy court determines the appropriate period of time over which a claim may be paid." *Id.* at 208. Although the market is one factor, courts also look to the type of property, the debtors' particular circumstances, the length of the underlying note, and a general lenience in allowing family farmers the maximum time for repayment. *Id.* at 208-09. *Woods* supports the perspective, which is compatible with *Travelers*, that the market is one significant factor among several factors that courts should consider. *See id.*; *Travelers,* 878 F.2d at 357-58.

Consistent with *Travelers* and *Woods,* the bankruptcy court in this case considered the market as a significant factor in assessing the plan term and did so without clear error.   As discussed above, the bankruptcy court had before it limited evidence of the market for loans like the Grigsbys' loan.   The bankruptcy court considered the Dutchuk affidavit, even if not directly relevant, as well as the Grigsbys' evidence of eight loans originating in 2009-12 and secured by both real estate and poultry houses.   These eight loans had terms ranging from eleven to twenty-

three years.  Admittedly, the eight loans have limited probative value for assessing the market in 2013, but the plan's eighteen-year term falls within the general range of their terms.  The bankruptcy court also considered the market terms of residential mortgage loans and noted that the terms usually exceed eighteen years and often reach thirty years.  The bankruptcy court did not clearly err when it considered this market in conjunction with the market for loans secured by poultry houses and equipment; Wells Fargo's loan is secured by residences and real estate as well as by poultry houses and equipment.

Having considered the market, the bankruptcy court properly endeavored to "balance the needs of the Debtors with the fair and equitable treatment of creditors, including Wells Fargo."[5] BK Doc. 129, ¶ 13.  The bankruptcy court considered the types of property at issue, the Grigsbys' particular circumstances, and the general policy in chapter 12 of favoring debt relief to family farmers. BK Doc. 129, ¶ 10 (consistent with *Woods*, 465 B.R. at 208-09).  Wells Fargo has not shown that the bankruptcy court clearly erred in weighing these factors and has "pointed to no **record** evidence to show" that the plan term does not give present value. *See Travelers*, 878 F.2d at 358 (emphasis added).  In view of the

---

[5]  Another factor in approving the term was that Wells Fargo's loan is oversecured by at least $75,000. BK Doc. 129, ¶ 13. If the Grigsbys do not perform under the plan, Wells Fargo may seek relief from the automatic stay. *Id.*  Wells Fargo argues that its loan is not adequately protected, but does so in the context of "retaining the lien" rather than in the context of "receiving present value." *See infra* Part B(1).

inexact balancing of interests and Wells Fargo's lack of record evidence, this court cannot say that the bankruptcy court clearly erred in its findings that the plan provides present value for Wells Fargo's loan and that the plan should be confirmed.

**B.    Retaining the Lien**

Wells Fargo argues that the confirmed plan does not satisfy the requirement under § 1225(a)(5)(B)(i) that Wells Fargo "retain" its lien.  Specifically, Wells Fargo argues that (1) the bankruptcy court clearly erred in its finding of fact that Wells Fargo is adequately protected and thereby retains its lien; and (2) the bankruptcy court erred as a matter of law by concluding that diverging from an assignment specifying the payer and the payment amount does not deprive a creditor of its lien.  For the reasons explained below, this court disagrees.

**(1)    Adequate Protection**

The requirement that the creditor "retain the lien" implies an inquiry into adequate protection. *See Abbot Bank-Thedford v. Hanna* (*In re Hanna*), 912 F.2d 945, 951 (8th Cir. 1990).  That is, a creditor does not truly retain its lien if the value of the collateral diminishes faster than plan payments are made on the secured claim. *Id.*  Wells Fargo argues that it does not retain its lien under the confirmed plan because, although the loan is presently oversecured, the value of the poultry houses and related

11

equipment will depreciate before the end of the eighteen-year plan such that Wells Fargo will no longer be adequately protected.

Wells Fargo's argument relies on the poultry houses and related equipment having a paramount role in the value of the entire collateral. Wells Fargo alleges that the poultry houses and related equipment are the "principal security" for the loan, together with the poultry proceeds but excluding the real estate and residences. Appellant's Br. 29. As discussed above, Wells Fargo should have submitted to the bankruptcy court any evidence that the poultry houses, related equipment, and poultry proceeds are the "principal security." Without that evidence, the bankruptcy court assessed whether Wells Fargo is adequately protected in view of all pieces of collateral. This court must do likewise notwithstanding the fact that Wells Fargo has presented relevant evidence on appeal.

To support its contention that the depreciation of poultry houses and related equipment would prevent it from retaining the lien, Wells Fargo relies primarily on *In re Rice*, 171 B.R. 399, 400 (Bankr. N.D. Ala. 1994). The court in *Rice* denied confirmation when the plan proposed a fifteen-year repayment term for a loan secured by poultry houses that had ten-year life expectancies. The court reasoned that the poultry houses "will not maintain their value at a rate equal to the rate the debt is being serviced." *Id.* at 401. In the present case, the record indeed contains evidence

12

that the value of the Grigsbys' poultry houses and related equipment will depreciate significantly before the end of the eighteen-year plan. *See, e.g.*, BK Doc. 57, Ex. C (Affidavit of Victor Dutchuk). *Rice*, in this respect, is on point. *See Rice*, 171 B.R. at 400-01. If the collateral consisted solely of poultry houses and related equipment, Wells Fargo would not be adequately protected and, therefore, would not retain its lien under the plan.

The additional collateral of real estate and residences, however, changes the *Rice* scenario. The collateral in *Rice* did not include real estate or residences. *Id.* Wells Fargo glosses over the significance of the separate non-farming property by contending that it did not constitute the "primary security." Appellant's Br. 29. With no evidence of this contention before the bankruptcy court, the bankruptcy court properly considered the entire collateral in assessing the risk of depreciation. "Real estate traditionally is not a depreciating asset and the fact that the [creditor's] claim is significantly over-secured affords the [creditor] protection." *In re Prescott*, 11-10789, 2011 WL 7268057 (Bankr. S.D. Ga. Dec. 21, 2011) (citation omitted). The bankruptcy court did not err in considering the generally lesser risk of depreciation for residences and real estate when evaluating the lien retention requirement.

Wells Fargo presented evidence that the poultry houses and related equipment would depreciate before the end of the eighteen-

13

year plan term, but presented no evidence **to the bankruptcy court** that this depreciation covered the collateral as a whole or would shift the loan's admitted over-security into under-security.  The bankruptcy court did not clearly err in finding that Wells Fargo is adequately protected by the collateral as a whole and thereby retains its lien under the plan.

**(2)   Change of payer and payment amount**

Wells Fargo next argues that it does not retain its lien under the plan because the plan provides for a payer and a payment amount for Wells Fargo's claim that differ from those specified in the Proceeds Assignment.[6]  The bankruptcy court concluded that Wells Fargo would retain its lien notwithstanding the difference.  This court finds that the bankruptcy court did not err in concluding that a creditor can retain its lien despite changes to the payer and payment amount, and that the bankruptcy court did not clearly err in finding that Wells Fargo would retain its lien under the plan notwithstanding the difference from the Proceeds Assignment.

Wells Fargo first addresses the change to the payer of the poultry proceeds, which the Proceeds Assignment designates as Koch

---

[6] The trustee claims that this argument is "last-minute," implying that Wells Fargo raised it for the first time on appeal.  In its objection to confirmation, Wells Fargo objected to the changed payer as not providing present value under § 1225(a)(5)(B)(ii), although not as violating the lien retention requirement under § 1225(a)(5)(B)(i), and "nullif[ying] Wells Fargo's lien on the Cash by eliminating the direct pay relationship between Wells Fargo and Koch Foods." BK Doc. 57, at 13.  The court finds that this language suffices as notice of Wells Fargo's position that the plan provisions did not satisfy the cramdown requirements.

Foods, but the plan designates as the Grigsbys.  Wells Fargo argues that courts "routinely decline to confirm" chapter 12 plans that fail to satisfy the "retain the lien" requirement and argues that courts should strictly construe it to permit no alteration to repayment provisions. Appellant's Br. 35.   The cases cited, however, do not support strict construction for Wells Fargo's lien.

The cases cited by Wells Fargo strictly construe the "retain the lien" requirement but only for undersecured creditors and creditors whose collateral is replaced with property of a different type.  One case concerned replacement of a livestock and equipment lien with a second mortgage on real estate——an inapposite comparison because this plan does not seek to replace Wells Fargo's collateral. *See In re Ames*, 973 F.2d 849, 851-52 (10th Cir. 1992). Another case found that the plan could not fund its plan with a creditor's cash collateral because the collateral would greatly diminish during the plan, thereby undermining the creditor's adequate protection and preventing it from "retaining the lien." *In re Stallings*, 290 B.R. 777, 787 (Bankr. D. Id. 2003).  However, the creditor in *Stallings* was undersecured, and later cases have confined *Stallings*' strict construction of "retaining the lien" to undersecured creditors. *See Harmon v. United States*, 101 F.3d 574, 578 (8th Cir. 1996) ("[T]he more natural reading of the [retain the lien] language is that the creditor must retain the pre-bankruptcy lien only insofar as it secures repayment of the secured claim");

15

*In re Wilson*, 378 B.R. 862, 882 (Bankr. D. Mont. 2007); *In re Bashas' Inc.*, 437 B.R. 874, 927 (Bankr. D. Ariz. 2010).  Given that Wells Fargo's claim is oversecured and the plan does not attempt to replace collateral, the bankruptcy court did not need to strictly construe the "retain the lien" requirement and could confirm a plan that made changes to the repayment provisions.

One case cited by Wells Fargo that more closely resembles the present case is *In re Blanton*, No. 3:09-bk-5923-3F2 (Bankr. M.D. Fla., Oct. 20, 2009).  However, this case does not stand for the proposition for which Wells Fargo cites it.  The bankruptcy court in *Blanton* acknowledged that the creditor had a security interest in poultry proceeds and was entitled to enforcement, i.e., payment per the strict terms, under § 552(b)(1) unless the court orders otherwise after notice, a hearing, and weighing the equities. *Id.* This provision **permitted** alteration to the strict terms of the lien if the alteration occurs after notice, a hearing, and weighing the equities. *Id.*  At no point did the *Blanton* court state that any alteration, or any particular alteration, to the repayment provisions would entirely deprive the creditor of its lien. *See id.* Indeed, the *Blanton* court did not even address the "retain the lien" requirement because it was not at issue. *Id.*

To the extent that Wells Fargo suggests otherwise by citing *Blanton,* the bankruptcy court satisfied § 552(b)(1) by giving Wells Fargo notice of the plan provisions, presiding over two

16

confirmation hearings, and weighing the equities.  Wells Fargo had notice from the amended plan that the Grigsbys intended to make the plan payments directly to Wells Fargo and had two confirmation hearings at which to address its concerns.  Wells Fargo's attorney cross-examined Mr. Grigsby on the role of Koch Foods (incorrectly transcribed as "Cook Foods") at the July 30, 2013, hearing, BK Doc. 128, at 44; and the parties discussed the plan payment schedule at the August 9, 2013, hearing, BK Doc. 126, at 15-17.  The fact that Wells Fargo never argued against the equities of those plan provisions at the hearings does not suggest that it did not have the opportunity to do so.  The bankruptcy court evidently weighed the burdens and benefits of the plan's repayment provisions for both sides but decided in favor of confirmation. *See, e.g.*, BK Doc. 129, ¶¶ 9, 10, 13 ("The Court must balance the needs of the Debtors with the fair and equitable treatment of creditors, including Wells Fargo.").

The bankruptcy court having weighed the equities after providing notice and a hearing, Wells Fargo's contention that the bankruptcy court "did not **properly** weigh the equities" is reviewed by this court for clear error, something not shown in this case. *See* Appellant's Reply 22.  Wells Fargo argues that the bankruptcy court could not have properly weighed the equities because of its allegedly inconsistent treatment of the Proceeds Assignment.  This treatment consists of the bankruptcy court's acknowledging that the

Proceeds Assignment has value that contributes to Wells Fargo's adequate protection and then confirming a plan that diverges from provisions in the Proceeds Assignment.  However, these actions are not incompatible.  Although the designation of Koch as the payer surely has some value, the bankruptcy court had no evidence or argument before it that the payer played a key role in providing adequate protection or that the payer's identity critically affects the collateral.  Without that context, the bankruptcy court did not clearly err in weighing the equities then confirming the plan with the different payer specified.

Turning to the divergent payment amount in the plan, Wells Fargo acknowledges that "ordinarily, modification of periodic payments under a chapter 12 plan is deemed not to modify the total value of a secured creditor's claim under the section 1225(a)(5)(B)(ii) analysis." Appellant's Br. 39.  Such modifications, presumably, also do not affect lien retention given that Wells Fargo included this acknowledgment in the "retain the lien" section of its brief. *See id.*  Indeed, plan payments differing from contractual payments is surely a common change to enable reorganization in bankruptcy.  Provided that the bankruptcy court weighs the equities after notice and a hearing, § 552(b)(1) permits the bankruptcy court to change repayment provisions, including payment amounts, in the plan.

Wells Fargo presents no case law to show that changing payment

amounts can entirely deprive an oversecured creditor of its lien. Rather, the cases cited restrict the plan's use of undersecured creditors' collateral and prohibit replacing collateral with property of a different type.  Neither scenario applies here.  The bankruptcy court, then, had no case-based reason to deviate from the general rule that modification of payment amounts does not affect the total value of a secured claim or lien retention.  The bankruptcy court also did not have evidence before it that provided a fact-based reason to find that this payment amount had particular significance.  Thus, the bankruptcy court did not clearly err in its finding of fact that Wells Fargo retains its lien even though the plan payments differ from the Proceeds Assignment's payments.

In sum, the court finds that the bankruptcy court did not err in concluding that a plan can alter the repayment provisions of a secured creditor's lien if those alterations do not replace the collateral with property of a different type and if the bankruptcy court weighs the equities after giving the creditor notice and a hearing.  As a matter of law, changing the payer and payment amount does not necessarily deprive a creditor of its entire lien.  Under the particular facts, the bankruptcy court did not clearly err in finding that the Grigsbys' plan would not deprive Wells Fargo of its lien by diverging from the provisions in the Proceeds Assignment.

**CONCLUSION**

For the reasons detailed above, the court will by separate order affirm the bankruptcy court's order confirming the Grigsbys' chapter 12 plan.

DONE this 10th day of January, 2014.


_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE